UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALD MOLNAR,

                    Plaintiff,                    No. 06-CV-15202-DT

vs.                                              Hon. Gerald E. Rosen

CARE HOUSE (Child Abuse and Neglect
Council of Oakland County), AMY ALLEN,
JANICE POKELY, CITY OF TROY, and
RENEE MOLNAR,

                    Defendants.
_____/

OPINION AND ORDER REGARDING DEFENDANTS'
MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

                At a session of said Court, held in
                the U.S. Courthouse, Detroit, Michigan
                on _____September 4, 2008_____

                PRESENT:  Honorable Gerald E. Rosen
                                United States District Judge

I. INTRODUCTION

        This Section 1983 action is presently before the Court on the motion to dismiss

and/or summary judgment filed by Defendants Janice Pokely[1] and the City of Troy, and

the motion for summary judgment filed by  Defendants Care House and Amy Allen.

_____

        [1] In his Complaint, Plaintiff spelled this Defendant's name as "Pokely."
However, in Defendants' motion, the Troy City Attorney spelled it "Pokley."  For the
sake of consistency, the Court will use the spelling used in the Complaint as that is the
spelling used on the Court's docket of the case.

1

Both of these motions have been fully briefed by the parties. Having reviewed and considered the parties' briefs[2] and supporting evidence, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.[3]

## II. PERTINENT FACTS

Plaintiff Gerald Molnar filed for divorce from his then wife, Renee Molnar, on February 8, 1998. The Molnars had four children together, three boys and one girl. According to the Amended Complaint in this action, soon after Plaintiff filed for divorce, Renee began accusing him of abusing their children. According to Plaintiff, these accusations began sometime in August of 1998 after Mr. Molnar expressed to Renee his concern about her brother, Brian Koch, a convicted sex offender, having access to their children. Renee allegedly responded to Mr. Molnar's concern by warning him, "You better watch out or you just might find yourself in the same boat one day." Plaintiff claims that after that date through May 1999, Renee made several allegations to the authorities that Plaintiff had sexually and physically abused their children. The authorities, however, found these allegations to be unsubstantiated.

Plaintiff's First Federal Lawsuit

---

[2] The Court has reviewed all of the briefs, including the Supplemental Brief appended to Plaintiff's Motion for Leave to Supplement [Dkt. No. 49]. Accordingly, this Motion is hereby GRANTED.

[3] Oral argument was scheduled on this motion for August 28, 2008. However, when Plaintiff's counsel failed to timely appear for the hearing, the Court decided to forego oral argument. Accordingly, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs.

Plaintiff thereafter filed a federal suit against Renee and various state actors claiming violations of his Constitutional rights. Plaintiff's claims in that case, *Molnar v. Lopez*, E.D. Mich. No. 00-75050, stemmed from actions taken by Renee in January 1999 who at that time entered the Molnars' oldest son, Alexander, into counseling with Oakland County Community Mental Health Authority ("OCCMHA") and allegedly "concealed the course of treatment" from Plaintiff. Mr. Molnar's theory in that case was that his ex-wife's actions violated the terms of their divorce decree and also that the various counselors and employees of the OCCMHA and the Oakland County Family Independency Agency (the "FIA") had conspired with his ex-wife to violate his Constitutional "right to parent"by damaging his relationship with his children. The Court (Roberts, J.), however, found that Mr. Molnar had provided no evidentiary support for his conclusory allegations and, therefore, found that he failed to make out a cognizable federal constitutional claim. Accordingly, on March 4, 2002, the Court dismissed Plaintiff's federal claims, declined to exercise supplemental jurisdiction over his state law claims, and entered judgment in favor of the defendants.[4]

Circumstances Giving Rise to the Instant Action

On October 8, 2003, Renee Molnar went to the Troy Police station and reported that her ex-husband had touched their daughter Elizabeth (a/k/a "Libby") in a sexual manner. Renee's complaint was referred to Detective Janice Pokely. Renee then met

---

[4] All of Judge Roberts' rulings were subsequently affirmed on appeal.

with Detective Pokely and reported that her then nine-year-old daughter told her that her father had put his hand down her pants and "touched her vulva." Detective Pokely then asked Renee to write out a witness statement and return it the next day, which Renee did.

Detective Pokely thereafter advised Renee that Elizabeth would need to be interviewed at Care House.

Care House is a private non-profit agency engaged "solely [in] the advocacy, prevention, intervention and treatment of child abuse and neglect." [Care House Brief, p. 11.] Care House performs forensic interviews with children under the age of 13 for all of the 46 police jurisdictions in Oakland County and the Department of Health and Human Services. Care House is used by the authorities so that interviews can be conducted in a less intimidating environment. Care House does not take private referrals and only accepts referrals and cases from law enforcement officials and Child Protective Services.[5] A portion of Care House's funding comes from Oakland County and other state agencies, and there are a number of community leaders and state officials who have seats on Care

---

[5] The "Oakland County: Child Sexual Abuse Investigative Protocol" states that when the DHS or a law enforcement agency receives a report of alleged sexual abuse, the agency "should" contact Care House to begin coordinating efforts in the investigation. [*See* Plaintiff's Ex. D.] There is no indication in the record of the precise relationship between Care House and the county social welfare and law enforcement agencies (i.e., whether the relationship arises out of a contract, or some statute or regulatory authority). Further, although Defendants state that Care House may refuse to conduct an interview under certain "specific circumstances," these circumstances are not elucidated in any of the parties' briefs.

House's Advisory Committee.[6]

On October 16, 2003, Care House employee, Amy Allen, conducted an interview with Elizabeth. No other person was in the room with Elizabeth and Ms. Allen. However Detective Pokely, a crisis counselor, an Oakland County Assistant Prosecutor, and Care House Coordinator Jennifer Hay were able to observe the interview through a two-way mirror. Elizabeth's mother, Renee, however, in no way participated in, or viewed, the interview. The interview was neither video-taped nor audio-recorded, and the only record of the interview is from the observers.

During the interview, Elizabeth stated several times that Plaintiff had placed his hands down her pants and "touched her vulva." Elizabeth's statements were consistent and Detective Pokely and the other observers determined that Elizabeth was a credible witness.

After the interview was conducted by Amy Allen, both she and Care House concluded their involvement in the case. The authorities' only contact with these Defendants after the interview was a telephone call by the police to confirm that a prior case involving Plaintiff and his children had been closed as not substantiated. The only other contact these Defendants had with Elizabeth after the interview was Amy Allen's

---

[6] Although Plaintiff's brief and exhibits show that there are Oakland County prosecutors, police officers (including Detective Pokely) and a number of judges who serve on the Care House Advisory Committee, none of the parties explain the purpose or power of the Advisory Committee or what influence it has over the day-to-day operations of Care House.

incidental contact with her while at subsequent court hearings.

On the same day as Elizabeth's Care House interview, Detective Pokely interviewed Plaintiff Molnar at his residence and delivered to him a motion for an emergency motion to determine visitation rights. At the time of this interview, Plaintiff was living with his friend, Mary Urban. When Detective Pokely explained the allegations to Plaintiff, he denied them and, in Detective Pokely's opinion, appeared "frustrated." Plaintiff also told Detective Pokely in this interview about his ex-wife's previous allegations of abuse and that all of these were found to be unsubstantiated.

Plaintiff claims that he explained to Detective Pokely during the interview that he moved in with Ms. Urban on the suggestion of his attorney, and that Ms. Urban was present at all times he was with his children. Ms. Urban confirmed Plaintiff's statement in an Affidavit she provided on May 19, 2007. Plaintiff also claims that he informed Detective Pokely that Renee's brother, Brian Koch, was a convicted pedophile and that he had objected several times to Brian having access to his children. He also claims that he informed Detective Pokely of the "threat" Renee had allegedly made when he had confronted her about her brother.

After the interview, Detective Pokely reviewed incident reports from other police departments that identified Plaintiff as a suspect in two other incidents involving acts that were sexual in nature.

An emergency hearing was conducted in the family division of the Oakland

County Circuit Court concerning Plaintiff's visitation rights. After hearing testimony, on October 24, 2003, Referee Michael Hand suspended Plaintiff's visitation rights.

Detective Pokely thereafter reviewed all the information she had gathered, reduced it to a narrative report, and submitted the report to the Oakland County Prosecutor on November 24, 2003. In her narrative report, Detective Pokely included her knowledge of past unsubstantiated accusations made against Plaintiff. She also noted that Plaintiff was then living with Ms. Urban; however, she did not mention anything about Ms. Urban having indicated that she had seen no inappropriate behavior on the Plaintiff's part while the children were with him, or the claim by Plaintiff that Renee's brother was a convicted pedophile.

On December 4, 2003, the Oakland County Prosecutor authorized a complaint and warrant charging Mr. Molnar with Criminal Sexual Conduct ("CSC"). Detective Pokely swore out the warrant in front of Magistrate Donald Chisolm and the Magistrate thereafter issued a warrant for Plaintiff's arrest. After Plaintiff was informed by his attorney that a warrant had been issued, he voluntarily turned himself in to the Troy Police Department on December 5, 2003.

On December 23, 2003, a three-hour preliminary examination was conducted. Elizabeth, Renee, Detective Pokely and Amy Allen all testified at this hearing, and Plaintiff's lawyer was able to cross-examine all witnesses. After the preliminary examination, Judge Drury determined that there was probable cause to charge Plaintiff

with CSC and bound him over for a criminal trial.

During the pendency of the criminal proceedings, proceedings concerning Mr. Molnar and his children continued in the family court. A petition to terminate Mr. Molnar's parental rights was filed with the Oakland County Circuit Court by the Oakland County Prosecutor's Office and the Family Independence Agency in December 2003. On December 23, 2004, Judge Daniel O'Brien held a bench trial on the petition. After hearing Elizabeth Molnar's testimony, Judge O'Brien concluded that the "alleged victim . . . [was] credible and the Respondent. . . [was] not." [1/5/05 Opinion and Order; Defendants' Supplemental Ex. 8]. The Court found by a preponderance of the evidence that Mr. Molnar had abused Elizabeth Molnar, terminated Mr. Molnar's parental rights, and made the children temporary wards of the court. *Id.*[7]

The criminal trial of Gerald Molnar took place in October 2005. The jury found Mr. Molnar not guilty of CSC. Plaintiff thereafter filed the instant action against Detective Pokely, the City of Troy, Care House, Amy Allen, and his ex-wife.

---

[7] This temporary suspension of Mr. Molnar's parental rights was subsequently made permanent in March 2008 by Oakland County Circuit Judge Leo Bowman based upon Mr. Molnar's repeated failure to follow court orders, failure to participate in court-ordered counseling, and his general failure to accept responsibility or effectuate real changes in his behavior. Given all of these failures, the Court determined that the conditions which led to the original suspension of parental rights continued to pose a viable threat to the children with no likelihood of remediation in the near future. [*See* 3/8/08 Opinion and Order, Defendants' Supplemental Ex. 9.]

III. <u>DISCUSSION</u>

A. <u>STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT</u>

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[8] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as

---

[8]"[T]aken together these three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials. . . ." 10A C. Wright, A. Miller, M. Kane, <u>Federal Practice & Procedure 3d</u>, § 2727.

follows:

> \* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> \* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> \* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

> \* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will apply the foregoing standards in deciding the Motions for summary judgment in this case.

B.     <u>PLAINTIFF'S CLAIMS AGAINST THE CARE HOUSE DEFENDANTS</u>

In his Complaint, Plaintiff alleges that Amy Allen and Care House (the "Care House Defendants") (1) are state actors and are liable for the violation of his civil rights, including unlawful seizure, procedural due process, equal protection and conspiracy; and (2) liable to him for intentional infliction of emotional distress. The Care House Defendants counter that are not "state actors," and hence, they cannot be held liable

10

under Section 1983. They further argue that even assuming they are state actors, they are still entitled to summary judgment because Plaintiff cannot show that the acts of these Defendants caused the deprivations of constitutional rights complained of. The also argue that Plaintiff has not made out a viable conspiracy claim under Section 1985. Finally, they argue that Plaintiff has failed to make out a legally cognizable claim of intentional infliction of emotional distress.

1.      THE CARE HOUSE DEFENDANTS ARE NOT STATE ACTORS

42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Section 1983's purpose is to guard against the "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. . . ." *Monroe v. Pape*, 365 U.S. 167, 184 (1961) (quoting *United States v. Classic*, 313 U.S. 299 (1941)). Two elements are necessary to state a cause of action under 42 U.S.C. § 1983. The plaintiff must plead and prove (1) that some person has deprived him of a federal right, and (2) that the person has done so under color of state law. *Adickes v S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

Plaintiff Gerald Molnar contends that Defendants Amy Allen and Care House may

be held liable under §1983 for his allegedly unlawful seizure, procedural due process failures, and his equal protection claim. However, as indicated, it is fundamental that only those acting "under the color of law" may incur liability under 42 U.S.C. §1983. A private party, however, may be deemed to be a "state actor" if the party's actions are "fairly attributable to the state." *See Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982); *see also Black v. Barberton Citizens Hosp.*, 134 F.3d 1265, 1267 (6th Cir. 1998) ("To determine whether a party's action constitutes state action, we ask whether the party's action 'may be fairly attributable to the state.'").

Decisions as to whether a private action may be considered a "state action" are fact specific and are made on a case-by-case basis. There is no one determining factor, or set of circumstances, that cause a private action to be *per se* "under the color of law;" therefore, a court must look to the specific facts of each case to reach a decision. *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295-96 (2001) ("[N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.").

Four tests have been used by the Supreme Court to determine whether the action by a private individual may by fairly attributable to the state. *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982). These tests are: (1) the public function test, *West v. Atkins*, 487 U.S. 42, 49-50 (1988); (2) the state compulsion test, *Adickes v. S.H. Kress*

& *Co.*, 398 U.S. at 170; (3) the joint action test, *Dennis v. Sparks*, 449 U.S. 24, 27 (1980); and (4) the symbiotic relationship or nexus test, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 721-26 (1961). The Sixth Circuit has only recognized, and Plaintiff only discusses in his brief, the public function, state compulsion, and symbiotic relationship/nexus tests.[9] [Plaintiff's Brief, pp. 3-6].

Under the public function test, a private party is deemed to be a state actor if the powers exercised by that party have traditionally been exclusively reserved to the state. *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). The standard used under this test is rigorous, and "[w]hile many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Brothers Inc. v. Lefkowitz*, 436 U.S. 149, 158 (1978). The state compulsion test involves determining whether the state has exercised such coercive power, or control over the defendant, that in law, the choice of the private actor is deemed to be that of the state. *Campbell v. PMI Food Equipment Group, Inc.*, 509 F.3d 776, 784 (6th Cir. 2007); *Wolotsky v. Huhn*, *supra* ("More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the state responsible for those initiatives."). Under

_____

[9] The Sixth Circuit does not recognize a separate "joint action" test to determine state action for purposes of Section 1983. "[T]his circuit recognizes three tests for determining whether its conduct is fairly attributable to the state: the public function test, the state compulsion test, and the nexus test." *American Postal Workers Union, Local 96 v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004), citing, *Wolotsky v. Huhn*, 960 F.2d 1331 (6th Cir.1992). Rather, it appears that in this Circuit, when it is alleged that a private party engaged in a joint activity with the State or its agents, the claim is dealt with as a conspiracy claim. *Id.* at 905-06.

the joint action test, a private party and the government share a common unconstitutional goal to deprive a person of their constitutional rights, and the private party is a willing participant. *See Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1446-47 (10th Cir. 1995). Finally, under the symbiotic relationship or nexus test, a §1983 claimant must "demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself." *Chapman v. Higbee Co.*, 319 F.3d 825, 834 (6th Cir. 2003), *cert. denied*, 542 U.S. 945 (2004).

Even though a private entity may receive large amounts of public funding, and receive clients through state agency referrals, those elements do not necessarily make the private entity a state actor. In *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), New Perspectives School, a private nonprofit entity, was sued under §1983 for allegedly improperly discharging employees. In that case, the plaintiffs alleged that the state significantly influenced the school, such that the discharge of employees could be deemed a state action. The students at New Perspectives were generally there by referral from the state, the school received 90 percent of its operating budget from public funds, and the majority of contracts the school entered into were with government agencies. *Id.* at 831-34, 840-42. The school was also required to comply with various local and state regulations to be eligible for public funds, but no person on its board of governors was a state employee or appointed by the state, and the school could refuse to accept any

student.  *Id.*  Notwithstanding the foregoing, the Court held that the school was *not* a state actor.  *Id.* at 841-42.  The Court rejected the argument that the school was a state actor because of the receipt of public funding.  The Court also stated that while there were regulations and contracts with the state regarding the acquiring of students, there was no evidence that those regulations coerced, controlled, or influenced decisions to discharge employees.  *Id.*

Plaintiff here first argues that Defendants are state actors under the public function test.  He argues that "forensic interviews" and investigations of potential crimes are "essential and/or integral part[s] of the State's obligation;" thus, he contends that because Defendants in this case performed that function they are state actors under the public function test. [Plaintiff's Brief, pp. 3-4.]   However, merely performing an essential or integral function of the state does not cause that person to be a state actor under this test.  The power exercised by a private person must have been a power traditionally *exclusively* reserved to the state.  Though governments traditionally perform investigations and "forensic interviews," those acts have not been exclusively within the power of the state.  There are many private investigators, and social workers, who perform investigative interviews.  One might rightly argue that charging a person with a crime meets the public function test, but the Care House Defendants here did not charge Mr. Molnar with a crime; the Defendants merely interviewed Libby.  Therefore, Defendants are not state actors under this test.

Plaintiff also contends that Care House and Amy Allen are state actors under the state compulsion test. Mr. Molnar claims that several connections between the State and Care House show that the State exercised enough coercive power, or provided significant encouragement, to find that Amy Allen's interview of Libby amounted to an action by the State. Plaintiff points to the following: 1) Care House only accepts clients through state agencies, 2) the protocol of Oakland County law enforcement agencies requires that they refer adolescents under the age of 13 to Care House, 3) Care House receives funding from state agencies, and 4) state employees are allowed to observe the interview.

As discussed above, in *Rendell-Baker*, the Court held that receipt of public funds, being a party to a government contract, and government referrals failed to prove that the state controlled or coerced the defendant to act in a certain way. 457 U.S. at 841-42. Similarly, in *Robert v. Stetson School, Inc.*, 256 F.3d 159 (3rd Cir. 2001), the court found that despite the facts that the defendant received a majority of its budget from public funds, the school obtained students through state referrals, and a majority of its contracts were with state agencies, the school was not a state actor. *Id.* at 162-63, 169. The court noted that no state employees or agencies influenced the day-to-day activities of the school, and that the school "had full control over its admissions process." *Id.* at 162-66.

In light of the *Rendell-Baker* and *Robert* decisions, none of the facts presented by Plaintiff in favor of this test are particularly relevant to the state compulsion test.

The only arguable connection with the state that might provide some basis for

application of the state compulsion test is Detective Pokely's membership on the Care House Advisory Committee. However, there has been virtually no evidence provided regarding Care House's Advisory Committee or Detective Pokely's role on the Committee. It is known that there are a number of civic leaders and state employees on the Advisory Committee, but the Court has not been provided any information as to the Committee's control over Care House's day-to-day operations or activities, in general, or the conduct of forensic interviews, in particular. Therefore, there is no evidentiary basis for the Court to conclude that the state has exercised such coercive power or control over the Care House Defendants to render them "state actors" under the state compulsion test.

The same issues above also apply to the symbiotic relationship/nexus test. Mr. Molnar argues that the state was intimately involved in the interview with Libby, and that there is a sufficient nexus between Care House and the State to find that Defendants were state actors. Mr. Molnar argues that evidence showing that a portion of Care House's funding comes from state, that state agencies are listed as "Community Partners" and that state employees, including judges and police officers, serve on Care House's Advisory Committee is sufficient to raise an issue of material fact regarding whether Care House is a state actor under this test. As the authorities discussed above demonstrate, Mr. Molnar's theory is not supported by the law. Far more than public funding and service by state employees on an advisory committee is required to establish a sufficiently close nexus between the government and the private party's conduct to trigger the § 1983

symbiotic relationship/nexus test. As the New York Supreme Court noted in *People v. Wilhelm*, 822 N.Y.S. 2d 786 (2006),

> Relevant indicia of state involvement which may transform private conduct into state action include: a clear connection between the police and the private investigation; completion of the private act at the instigation of the police; close supervision of the private conduct by the police; and a private act undertaken on behalf of the police to further a police objective.

*Id.* at 792, quoting *People v. Greene*, 760 N.Y.S.2d 769 (2003).

Here, although the Troy police referred Elizabeth to Care House, there is no evidence of record suggesting that the police or the prosecutor's office supervised, directed or otherwise participated in her interview. While it is true that the authorities were able to observe the interview, they did not participate in the questioning. And, once Amy Allen completed her interview of Elizabeth, her role in this matter -- and Care House's role, as well -- ended.

In sum, the Court finds insufficient evidentiary support for Plaintiff's contention that Defendants Amy Allen and Care House were "state actors" so as to render them potentially liable under 42 U.S.C. § 1983.

2.      EVEN ASSUMING *ARGUENDO* THAT THE CARE HOUSE DEFENDANTS WERE STATE ACTORS, THEY ARE STILL NOT LIABLE UNDER § 1983

(a)     The Care House Defendants' Actions Were Not the Proximate Cause of Plaintiff's Alleged Injuries.

General principles of tort law govern liability imposed by § 1983. *Horn by Parks v. Madison County Fiscal Court* 22 F.3d 653, 659 (6th Cir. 1994) (holding that a

"proximate causation is an essential element of a §1983 claim for damages."). The causation requirement in §1983 is not satisfied by mere causation in fact; the plaintiff must also establish proximate causation. *Sutkiewicz v. Carlson*, 850 F.Supp. 579, 588 (E.D. Mich. 1994) (quoting *Arnold v. International Business Machine Corp.*, 637 F.2d 1350 (9th Cir. 1981)), *rev'd on other grounds by Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352 (6th Cir. 1997). In *Sutkiewicz*, this Court stated that in a §1983 action, the proximate cause of a plaintiff's injury for false imprisonment would ordinarily be the court order committing him to the psychiatric facility, and that generally, the various preliminary steps leading to the court order are only remote causes of the injury and do not rise to proximate or legal causation. *Id.* at 588-89 (quoting *Houston v. Humboldt County*, 561 F.Supp. 1124 (D. Nev. 1988)).

In *Sutkiewicz*, the plaintiff who had been arrested for murder was thereafter held in a mental hospital for ten years pursuant to a court order finding him to continue to be incompetent to stand trial. After he was released from the hospital and the charges against him dropped, the plaintiff brought an action under §1983 claiming that his civil rights had been violated by the detectives who had investigated the murder when they failed to turn over potentially exculpatory evidence to the judge presiding over his case and the psychiatrists who had ordered his continued detention. The detectives claimed that their actions in investigating the murder were merely preliminary steps to the court's continued detention order and, therefore, they could not be held liable under §1983. *Id.*

at 581-87. However, this Court declared that "situations involving the presentation of false evidence or the withholding of evidence are exceptions to the general rule that . . . a court order breaks the chain of causation." *Id.* at 589 (quoting *Ames v. United States*, 600 F.2d 183 (8th Cir. 1979)). In that case, the defendants' motion to dismiss was denied since there was a question of fact as to whether the detectives had withheld information that would have allowed the plaintiff to exit the mental hospital sooner. *Id.* at 591.

By contrast, here, by (1) interviewing Elizabeth on October 16, 2003, (2) informing Troy Police that another abuse claim file involving Mr. Molnar and his children had been closed as unsubstantiated, and (3) testifying as a witness for Mr. Molnar at the preliminary hearing on December 23, 2003, the Care House Defendants merely conducted preliminary acts. As a general rule it is the overt acts, not the preliminary acts, that are the proximate cause of the injury in a §1983 claim. In this case, the overt acts were first, the decision by the Oakland County Prosecutor to file criminal charges against Plaintiff, and second, the ruling by Judge Drury that there was probable cause to bind Plaintiff over for trial. These acts break any link of causation as to the actions of the Care House Defendants.

Plaintiff does allege that Amy Allen conspired with other Defendants to provide false information and withhold exculpatory evidence, and that she lied when she testified that after her one interview with Libby, Ms. Allen had no further contact with her (other than incidental contact in the courtroom). As evidence of this allegedly false testimony,

Plaintiff has submitted a Protective Services "Updated Service Plan" that indicated that Elizabeth's case file with Care House was "open" from 10/19/2003 to 01/19/2004, i.e., well after Libby's interview with Amy Allen. [Plaintiff's Exhibit J]. However, a full review of the record shows that although the Care House file remained open, there was no further contact with Elizabeth. Therapy information records show that Care House did telephone Renee Molnar and suggested that Libby receive long term therapy from a source other than Care House. [Defendants' Exhibit 2, p. 12]. Renee, however, requested another appointment with Care House before Libby's long term therapy with the other provider began, and an appointment with Care House was scheduled for November 26, 2003. *Id.* However, Libby and Renee did not keep the appointment and never set up another. *Id.* The file was then closed on January 19, 2004 with an entry stating that all of the Molnar children had a non-Care House long-term therapist and that therapy at Care House never started. *Id.*

Plaintiff also claims that Defendants withheld knowledge of the history of false accusations made by Renee; however, there is evidence of record indicating that Care House did inform police that a prior allegation had been closed as unsubstantiated. [Plaintiff Brief, p. 10; Defendant Exhibit 3, ¶11].

Because there is no other evidence supporting an allegation that Defendants provided false information or withheld exculpatory evidence, the general rule as to causation applies and Defendants' preliminary acts did not rise to the level of proximate

cause.  The causal link between the interview conducted by Amy Allen and the Plaintiff's alleged injuries was broken by the decisions of the prosecutor and Judge Drury.

(b)     Plaintiff Has Failed to Provide Evidence of a Conspiracy and Has Failed
        to Plead or Prove that Defendants Acted with a Class-Based Animus

Mr. Molnar also contends that Care House and Amy Allen conspired with the other Defendants to violate his constitutional rights.

42 U.S.C. § 1985 provides a private cause of action for "conspiracy to interfere with civil rights."  42 U.S.C. § 1985(3) provides for the recovery of damages caused by persons who conspire "for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws," and the relevant part §1985(2) prohibits "two or more persons conspir[ing] for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws."  42 U.S.C. § 1985(2).  The statute provides for the recovery of damages occasioned by such a deprivation of rights.

To succeed under a §1985 conspiracy claim, a plaintiff must prove "(1) a conspiracy [among two or more persons]; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."  *Radvansky v. City of Olmsted Falls*, 395 F.3d

291, 314 (6th Cir. 2005) (quoting *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)). To overcome summary judgment, "conspiracy claims must be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007).

Courts have found that the relevant portions of § 1985 require a plaintiff who brings a claim for a civil rights conspiracy to also plead and prove that the conspiracy has "some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Radvansky*, 395 F.3d at 314 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)); *see also Peters v. Fair*, 427 F.3d 1035, 1038 (6th Cir. 2005) (holding that because the plaintiff did not provide evidence showing that the conspiracy was motivated by racial or other class-based animus the district court properly dismissed the civil rights conspiracy claim).[10]

The facts in this case certainly demonstrate that the various Defendants had been

_____

[10] *But see*, *Kush v. Rutledge*, 460 U.S. 719, 724-27 (1983). In *Kush*, the Supreme Court stated that a plaintiff is not required to plead that the conspiracy was motivated by racial or other class-based animus if the conspiracy claim is brought under the first part of 42 U.S.C. § 1985(2). The first part of § 1985(2) is not implicated in this case. It relates to obstruction of justice in federal courts and contains no requirement of equal protection. However, in our case Mr. Molnar's claim stems from an alleged conspiracy in a state court action, not a federal court. Thus, only the second part of § 1985(2) is implicated and Mr. Molnar must plead that the conspiracy was motivated by racial or other class-based animus. *See also*, *Wright v. Illinois Dept. of Children & Family Services*, 40 F.3d 1492, 1507 (7th Cir. 1994) ("While a plaintiff must allege class-based animus to state a claim for denial of access to state courts, no such requirement exists for an action asserting denial of access to federal courts.").

involved with the Molnars over a period of several years. Further, the record evidence shows that it is protocol for law enforcement in Oakland County, Care House, and the Department of Human Services to collaborate on child sexual abuse cases. [See Plaintiff Exhibit D]. However, the Plaintiff's allegations that Defendants conspired together to injure Mr. Molnar appear to be mere conjecture.

Plaintiff claims that Care House and Amy Allen met with Libby on more than one occasion and suggests that during those additional meetings Defendant Allen coached Libby how to testify against Mr. Molnar. However, Plaintiff has provided no evidence to support those allegations while Defendants have provided patient records clearly refuting the allegation that Libby came to Care House after the one forensic interview. [*See* Defendants' Exhibit 2, p. 12]. Plaintiff also claims that Defendants conspired during meetings with law enforcement officials to deprive Mr. Molnar of constitutional rights. However, again, Plaintiff offers no specific facts regarding these alleged meetings. The evidence submitted only shows that it is protocol for Care House and law enforcement to coordinate their investigations. [*See* Plaintiff's Exhibit D].

Finally, Plaintiff has neither plead nor proven that the alleged conspiracy was motivated by a racial or other class-based animus, nor has he shown that he was deprived of a constitutional right.

In sum, the Court concludes that Plaintiff has failed to make out any legally cognizable federal claim against the Care House Defendants.

C.    PLAINTIFF'S CLAIMS AGAINST THE MUNICIPAL DEFENDANTS

Plaintiff alleges that the municipal defendants, Detective Janice Pokely and the City of Troy, violated his Fourth Amendment rights and his Fourteenth Amendment rights to due process and equal protection due to the criminal investigation conducted with regard to his daughter's allegations of sexual touching.  Specifically, he contends that he was charged and arrested without probable cause.  He also alleges that these Defendants conspired with the Care House Defendants and his ex-wife to violate his constitutional rights.  He also alleges that these Defendants, like the Care House Defendants, are liable to him for intentional infliction of emotional distress.  Defendants counter that Plaintiff has failed to state any constitutional claim based upon the actions of Detective Pokely and the City of Troy.  In particular, the Municipal Defendants maintain Plaintiff's claims are barred by collateral estoppel.  They also argue that because Detective Pokely had probable cause to seek a warrant Plaintiff has no legally cognizable cause of action for unlawful seizure or violation of due process.  They further argue that even if Plaintiff has stated a claim, Detective Pokely is entitled to qualified immunity.

1.    THE DOCTRINE OF COLLATERAL ESTOPPEL PRECLUDES
       PLAINTIFF FROM ATTACKING PROBABLE CAUSE BECAUSE THE
       STATE COURT ALREADY MADE A VALID FINAL JUDGMENT
       THAT PROBABLE CAUSE EXISTED IN A CRIMINAL PROCEEDING
       AND PLAINTIFF HAD A FULL AND FAIR OPPORTUNITY TO
       LITIGATE THE ISSUE DURING THE PRELIMINARY
       EXAMINATION.

Defendants first argue that Plaintiff is precluded from pursuing his unlawful arrest

claims in this lawsuit because the state court ruled on the issue of probable cause. Defendants contend that Plaintiff was given an opportunity to contest the issue of probable cause at the preliminary exam hearing and is, therefore, foreclosed from relitigaing the issue.

Plaintiff argues that the issue of probable cause is not collaterally estopped because the issue brought before this court is not the same issue that was actually litigated and necessarily determined in the state court. Plaintiff contends that the "issue of the *legality of Plaintiff's arrest* and the *integrity of the police investigation* was not litigated and/or determined at the state court's preliminary hearing." (Plaintiff's Brief in Response, p. 11). Plaintiff cites several cases for the proposition that a claim challenging the integrity of the evidence, or a claim asserting that the police acted in bad faith is not collaterally estopped by a finding of probable cause in the state court.[11]

This Court must apply Michigan law in determining whether the state court's determination of probable cause at the preliminary hearing has preclusive effect. *Haring v. Prosise,* 462 U.S. 306, 313-14 (1983) (federal courts are generally required "to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so.") Under Michigan law, collateral estoppel applies where 1) there is identity of parties across the proceedings, 2) there was a valid, final judgment in the first proceeding, 3) the same issue was actually litigated and necessarily

---

[11] *E.g. Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001).

determined in the first proceeding, and 4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding. *People v. Gates*, 434 Mich. 146, 154-57, 452 N.W.2d 627, 630-31(1990), *cert. denied*, 497 U.S. 1004 (1990).

Further, where "the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action." *Smith v. Thornburg*, 136 F.3d 1070, 1077 (6th Cir. 1997); *Gaddis v. Redford*, 188 F. Supp. 2d 762 (E.D. Mich. 2002) (Motorist was collaterally estopped from asserting that police lacked probable cause to arrest him, as required for claim of false arrest; probable cause, under Michigan law, was found during motorist's preliminary hearing, at which he had counsel and full and fair opportunity to litigate issue).

There are, however, occasions where a finding of probable cause in a state court preliminary hearing will not preclude a plaintiff from litigating a federal claim in federal court. When a plaintiff alleges a police officer acted in bad faith, provided false information, or misstated material facts in order to establish probable cause, collateral estoppel will not apply. *Taylor v. City of Detroit*, 368 F. Supp. 2d 676 (E.D. Mich. 2005) (collateral estoppel will not apply to finding of probable cause at preliminary examination if plaintiff's false arrest claim under § 1983 is based upon officer supplying

false information); *Buttino v. City of Hamtramck*, 87 Fed. Appx. 499, 504 (6th Cir. 2004) (action alleging bad faith by police officer challenges integrity of evidence rather than sufficiency of evidence); *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (holding that the state court's determination of probable cause at the preliminary hearing was not identical to the issue of whether Officer Bragg made materially false statements to the state judge that formed the basis of the probable cause determination.). Nevertheless, even though a plaintiff might be allowed to bring a claim relying on a police officer's bad faith, misrepresentation of facts, or supplying false information, he still must provide evidence to support his claim or it will be dismissed. *Buttino*, 87 Fed. Appx. at 504.

In this case, there is identity of parties across the proceedings;[12] second, after a preliminary hearing the state court made a finding that there was probable cause to charge the Plaintiff with Criminal Sexual Misconduct (CSC); and third, there is no contention by Plaintiff that he was not given a full and fair opportunity to litigate the issue in the preliminary hearing. However, Plaintiff states that in this case he is attacking the "integrity of the police investigation" and not merely the issue of probable cause. Viewing this in the light most favorable to the Plaintiff, he can be seen as claiming that Detective Pokely either acted in bad faith, provided false information, or misstated

---

[12] *See Buttino v. City of Hamtramck*, 87 Fed. Appx. at 505 n.4 (noting that Michigan courts have held that identity of parties exists when the first suit was a criminal matter and the second suit is a civil matter); *see also Knoblauch v. Kenyon*, 163 Mich. App. 712, 415 N.W.2d 286, 723 (1987) ("Michigan courts have similarly repudiated the mutuality requirement in the criminal to civil context.")

material facts to establish probable cause.

There is, however, no evidence showing Detective Pokely provided false information. Plaintiff also fails to provide evidence supporting a claim of bad faith; therefore, the question is whether Detective Pokely misstated facts, or purposely left out certain facts, in order to show probable cause. The argument which appears many times in Plaintiff's brief and complaint is that Detective Pokely's knowledge of Renee's past unsubstantiated claims, Renee's pedophile brother, and that Ms. Urban was with him at all times the children were in his presence foreclosed the possibility of Detective Pokely having probable cause. In the narrative report Detective Pokely submitted to the prosecutor, she made known that the family had previous contacts with Child Protection Services, that Renee had previously made accusations of this nature that were found to be unsubstantiated, and that the Plaintiff was living with Ms. Urban so that children could visit him. [Defendants' Exhibit 1 at pp. 6, 9]. Detective Pokely did fail to mention Ms. Urban's statement that she was with the Plaintiff at all times and saw no inappropriate behavior on the part of the Plaintiff; she also failed to mention that Renee's brother allegedly was a pedophile. However, Plaintiff was in possession of that evidence and had ample opportunity to bring that evidence to the judge's attention at the preliminary exam.

Because the evidence when viewed in the light most favorable to the Plaintiff fails to support the allegation that Detective Pokely acted in bad faith, provided false information, or misstated material facts to establish probable cause, collateral estoppel

bars his claim challenging the constitutionality of his arrest.  Summary judgment is,

therefore, proper.

2.      THERE WAS PROBABLE CAUSE TO ARREST AND CHARGE
        PLAINTIFF MOLNAR

Assuming *arguendo* that Plaintiff's Fourth Amendment false arrest claim is not

barred by collateral estoppel, Defendants assert that there was probable cause for the

arrest and, therefore, no Fourth Amendment violation occurred.  Defendants contend that

statements from the victim Elizabeth Molnar, bolstered by corroborating evidence,

clearly support probable cause.  In support, Defendants rely on *Ahlers v. Schebil*, 188

F.3d 365 (6th Cir. 1999).  Plaintiff counters that probable cause was lacking because (1)

other than Libby, the alleged victim, there was no eye witness to the alleged sexual

misconduct, (2) Detective Pokely carried out an incomplete and poorly conducted

investigation, and (3) Detective Pokely failed to disclose exculpatory evidence to the

district court.

In order to determine whether probable cause existed, the court must look at the

"totality-of-the-circumstances" and determine whether the facts and circumstances within

the officer's knowledge at the time of the arrest, of which he or she had reasonably

trustworthy information, were sufficient to warrant an objectively reasonable officer to

believe that the plaintiff had committed or was committing an offense.  *United States v.

Romero*, 452 F.3d 610, 615–16 (6th Cir. 2006), *cert. denied*, 127 S.Ct. 1320 (2007).  An

officer must show more than mere suspicion, but is not required to "possess evidence

sufficient to establish a *prima facie* case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt." *Id.* If facts are in dispute that would raise the issue whether or not probable cause actually existed, summary judgment is inappropriate. *Ahlers v. Schebil*, 994 F. Supp. 856, 872–73 (E.D. Mich. 1998), *aff'd*, 188 F.3d 365 (6th Cir. 1999). Also, a previous finding of probable cause by a state court is given considerable weight. *See Smith v. Thornburg*, 136 F.3d 1070, 1077 (6th Cir. 1997) ("[A] finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action.").

(a)     Detective Pokely's Reliance on Elizabeth's Statement Accusing the Plaintiff of Sexual Misconduct to Establish Probable Cause was Proper Since Elizabeth was the Victim and was Believed to have had First Hand Observations of the Crime, and Elizabeth's Statements were Consistent and All Authorities Involved Viewed Her as a Credible Witness

A victim's eyewitness statements "based on firsthand observations . . . are generally entitled to a presumption of reliability and veracity," and law enforcement officers are "entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest." *Ahlers v. Schebil*, *supra*, 188 F.3d at 370.

When probable cause is established from a statement by an eyewitness, the individual attacking probable cause must provide evidence that the law enforcement officers had reason to believe the testimony of the witness was untruthful or unreliable. In *Ahlers*, a female prisoner accused a police officer of sexual misconduct. The

31

investigating officers relied on the alleged victim's eyewitness testimony to establish probable cause and obtained a warrant to arrest Officer Ahlers. After charges were dropped, Ahlers sought damages under 42 U.S.C. § 1983 and argued that he had been charged and arrested without sufficient probable cause. *Id.* at 369. In that case, the court found that law enforcement officers may properly rely on firsthand testimony from a victim to establish probable cause. The court stated that Ahlers was required to provide evidence that the defendants had reason to believe the victim's testimony was untruthful or unreliable in order to sustain a claim that there were genuine issues of fact regarding the existence of probable cause. *Id.* at 370-371 ("An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, [or] did not accurately describe what he had seen. . . .") (internal quotations omitted). Because Ahlers submitted no evidence to support a claim that the victim's testimony was untruthful or unreliable, the court found that there was probable cause. *Id.* at 371.

When a child victim gives inconsistent statements about an accusation of sexual abuse, the child's accusation alone may not be enough to establish probable cause. In *Cleary v. County of Macomb*, No. 06-15505, 2007 WL 2669102, *1 (E.D. Mich. 2007), the plaintiff's ex-girlfriend accused him of sexually abusing their young daughter. During interviews with police officers, and psychologists, the daughter made inconsistent statements regarding the alleged sexual abuse. *Id.* at **2–4. The daughter told

authorities she felt like she was being forced to testify by her mother, and several individuals felt the daughter was a "weak witness;" however, the county still went through with the charge and arrest. *Id.* at **4–5. The daughter was also inconsistent in her trial testimony. *Id.* at *5. Relying on *Ahlers*, the county argued that the child's accusations were sufficient to establish probable cause. However, after reviewing the facts, the trial court distinguished that case from *Ahlers*, and concluded that the inconsistent accusations from the child-victim alone could not definitively provide the basis for probable cause. *Id.* at *18.

In this case, during an interview on October 16, 2003, Elizabeth stated that her father, the Plaintiff, placed his hands down her pants and "touched her vulva." Though, like the alleged victim in *Cleary*, Elizabeth was a child when her statements were made, unlike *Cleary*, there is no evidence that any of the investigating officers viewed, or should have viewed, Elizabeth's testimony as untruthful, unreliable, or inconsistent. All the evidence presented shows that Elizabeth made no contradictory statements during her interview, and all those involved viewed her as a credible witness. Officer Pokely, therefore, was entitled to rely on Elizabeth's statements to establish probable cause.

(b)     Detective Pokely was Under No Obligation to Continue an Investigation into Exculpatory Evidence Once Probable Cause was Established; Therefore, Since the Evidence Actually Possessed by Detective Pokely at the Time of the Plaintiff's Arrest Supported Probable Cause, the Thoroughness of the Investigation Does Not Bring the Finding of Probable Cause into Question.

Once a law enforcement officer has "probable cause" he is under no duty to

continue the investigation to determine whether exculpatory evidence existed, and is under no obligation to investigate, or give credence to, a suspect's story or alibi. *Ahlers*, 188 F.3d at 371. *See also Logsdon v. Hains*, 492 F.3d 334 (6th Cir. 2007) ("After a law enforcement officer determines, on the basis of the facts and circumstances known to him, that probable cause exists to support an arrest, the officer has no further duty to investigate or to search for exculpatory evidence.").

The question for a court reviewing a question of probable cause is not whether the law enforcement officers conducted a thorough investigation, but whether the totality of evidence actually in the possession of the officers would lead an objectively reasonable officer to conclude the individual committed a crime. In *Ahlers*, the plaintiff contended that the defendants' failure to conduct a thorough investigation constituted a reckless disregard for truth and brought into question the finding of probable cause. *Ahlers*, 994 F. Supp. at 875–76. It was admitted by an investigating officer that a "thorough" investigation had not been conducted.[13] *Id.* at 876. This Court found that the mere fact an investigation is not "thorough" does not determine *per se* that an individual's constitutional rights have been violated, and held that though officers could have conducted a more professional investigation, probable cause had been established. *Id.* at 876–77. Later, on appeal, the Sixth Circuit affirmed this holding, but stated that this

_____

[13] According to an officer in *Ahlers*, a thorough investigation would have included interviewing witnesses, collecting evidence, photographing the scene, collecting any tangible evidence, and preserving evidence. 994 F. Supp. at 876.

finding did not mean officers may "make hasty, unsubstantiated arrests with impunity." *Ahlers*, 188 F.3d at 371. The question is whether the evidence in totality, known to the officers at the time of arrest, would lead an objectively reasonable officer to conclude there was probable cause, not whether a professional and thorough investigation had been conducted. *Id.* at 371–72. A determination of probable cause is based upon information the officer actually had, rather than information he could have had if he had continued to gather further evidence. *Id.* at 371 (citing *Crisp v. City of Kenton*, 142 F.3d 432 (6th Cir. 1998)). However, if officers actually possessed exculpatory evidence that would have led a rational officer to conclude he or she lacked probable cause, but simply turned a "blind eye" to the evidence in its investigation, summary judgment is improper. *Ahlers*, 188 F.3d at 372.

The question is not whether Detective Pokely conducted a thorough and professional investigation; rather, it is whether a reasonable officer would have concluded there was probable cause at the time of the arrest, given the totality of the evidence actually known to Detective Pokely. The evidence actually known to Detective Pokely at the time of arrest was (1) Elizabeth's eyewitness statement, (2) evidence that Elizabeth and Plaintiff had contact during the time period in which the alleged incident occurred, (3) evidence that Renee had in the past made unsubstantiated claims, but not Elizabeth, (4) evidence that Plaintiff lived with Ms. Urban, who he claimed was with him at all times he was with his children, 5) a claim by Ms. Urban that she had seen no

inappropriate conduct by Plaintiff, and 6) evidence that Plaintiff claimed Renee's brother was a pedophile.

In view of the facts actually known to Detective Pokely at the time of the arrest, an objectively reasonable officer would have believed Plaintiff committed a crime. Elizabeth's statement together with the knowledge that Elizabeth and Plaintiff had contact during the time period in question, established probable cause. The evidence Plaintiff provides in his favor is not sufficient to invalidate probable cause. The unsubstantiated claims proffered by Renee do not cause Elizabeth's statements to become unreliable, especially where the interview in which the statements were made did not involve Renee.

Further, Detective Pokely was under no duty to investigate, attempt to substantiate, or believe the alibis given by Plaintiff. It is understandable for an objective officer to question the claim that Ms. Urban was with Plaintiff at <u>all</u> times he was with his children. Additionally, Pokely was under no duty to track down Brian Koch and further investigate his activities. In further support of this conclusion, the judge also concluded that the evidence supported probable cause, and Plaintiff had ample opportunity to bring all evidence to the judge's attention during the preliminary exam. When weighed against Elizabeth's statement, the possible exculpatory evidence would not alter an objectively reasonable officer's view that probable cause existed at the time of Plaintiff's arrest.

(c)    Detective Pokely was Not Required to Turn Over Exculpatory Evidence
       Where Plaintiff was in Possession of All Exculpatory Evidence and None

Law enforcement officials are constitutionally required to turn over "material" exculpatory evidence.  In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court found that when the prosecution suppresses evidence favorable to an accused, there is a violation of due process where the *evidence is material* either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  In *United States v. Agurs*, 427 U.S. 97 (1976), the Court extended this principle and held that the prosecution has a constitutional duty to volunteer exculpatory matter to the defense, even in the absence of a specific request for *Brady* material.

What must be determined in deciding whether certain alleged "exculpatory" evidence was improperly withheld in the determination of probable cause is: (1) was the evidence actually within the knowledge of law enforcement officers; (2) whether the evidence was actually withheld; (3) whether the evidence was favorable to the accused, and (4) whether the evidence excluded was "material."  *Ahlers*, 188 F.3d at 371 (only evidence actually within the knowledge of the investigating officers at the time of the arrest, not potential evidence officers could have had if the investigation had continued, is used by a court to determine whether an officer had probable cause).  Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Plaintiff claims that Detective Pokely withheld exculpatory evidence and this negated any probable cause. The alleged evidence the Plaintiff argues is exculpatory is 1) Detective Pokely's knowledge of the unsubstantiated claims made by Renee, 2) Plaintiff's statement that Renee had a brother who was a pedophile, and 3) Ms. Urban's statement that she was with the Plaintiff at all times Elizabeth was present and saw no inappropriate conduct by Plaintiff. As indicated, Detective Pokely was only required to offer exculpatory evidence if she had actual knowledge of the evidence and it was "material."

First of all, Detective Pokely submitted evidence regarding the prior unsubstantiated claims in her narrative report to the county prosecutor, and therefore that evidence was not improperly withheld by her. Second, though the Plaintiff informed Detective Pokely of Renee's pedophile brother, Detective Pokely was under no duty to substantiate his claim or investigate Brian Koch with regard to establishing probable cause as to Mr. Molnar. Because Detective Pokely did not investigate the matter, she had no actual evidence regarding Brain Koch. Lastly, with regard to Ms. Urban's statement that she was with the Plaintiff at all times and saw no inappropriate behavior between Elizabeth and Plaintiff, Detective Pokely was under no duty to give credence to Ms. Urban's statement in her determination of probable cause. It also should not be forgotten that Plaintiff had knowledge of this alleged "exculpatory" evidence and had the opportunity to submit the evidence himself to the Judge at the probable cause hearing.

It is also doubtful that Plaintiff's claim that Renee had a pedophile brother and Ms. Urban's statement when viewed together would be considered "material." In this case the question would be whether there is a reasonable probability that the Magistrate's determination that probable cause existed would have been different if the evidence in question would have been disclosed. Because of the weight that would be given to Elizabeth's eyewitness statement, it is doubtful those claims would have negated a finding of probable cause.

In sum, Detective Pokely was entitled to rely on Elizabeth's statements to establish probable cause since there is no evidence that Elizabeth's statements were inconsistent, unreliable, or untruthful. Further, after establishing probable cause, Detective Pokely was under no duty to continue an investigation into whether there was any exculpatory evidence supporting the Plaintiff. Lastly, there was no exclusion of "material" exculpatory evidence. Therefore, the Court concludes that probable cause was established to obtain an arrest warrant. Plaintiff's Fourth Amendment claim of unlawful arrest, therefore, is without merit.

3.      PLAINTIFF HAS FAILED TO SHOW DETECTIVE POKELY
        VIOLATED ONE OF HIS FUNDAMENTAL RIGHTS, AND NO
        EVIDENCE OF A DEFICIENCY IN THE PROCEDURAL PROCESS
        HAS BEEN SHOWN.

Two elements are necessary to state a cause of action under 42 U.S.C. § 1983. The plaintiff must plead and prove (1) that some person has deprived him of a federal right, and (2) that the person has done so under color of state law. *Adickes v S.H. Kress*

*& Co.*, 398 U.S. 144, 150 (1970).  Plaintiff in this case alleges four separate deprivations of a federal right: (1) unlawful seizure; (2) violation of procedural due process; (3) equal protection; and (4) conspiracy.

(a)     Plaintiff's Unlawful Seizure Claim Fails Since Probable Cause was Established.

Defendants assert that Plaintiff has failed to state an unlawful seizure 42 U.S.C. § 1983 claim.  Defendants' main argument in this section is that there was never an actual seizure because Plaintiff voluntarily turned himself into the police after his lawyer informed him that a warrant for his arrest had been issued.

Under Michigan law, "[a]n arrest is the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, *or by any act which indicates an intention to take him into custody* and subjects the person arrested to the actual control and will of the person making the arrest."  *People v. Woods*, 16 Mich. App. 718, 720, 168 N.W.2d 617, 618 (1969) (emphasis added).  Under the Fourth Amendment, to determine whether there was an arrest, it must be determined whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Saari,* 272 F.3d 804, 808 (6th Cir. 2001) (quoting *United States v. Mendenhall,* 446 U.S. 544 (1980)).  Further, in *Albright v. Oliver*, 510 U.S. 266, 271 (1994), the Supreme Court held, in dicta, that a civil rights claimant's surrender to state authority, in the form of an arrest warrant, constituted a "seizure" for purposes of the Fourth Amendment.

Defendants rely on *Skousen v. Brighton High School*, 305 F.3d 520 (6th Cir. 2002), for the argument that the Detective Pokely did not seize or arrest Plaintiff. In *Skousen*, the plaintiff sued Trooper Rambo for unlawful seizure. *Id.* at 523. In that case, the plaintiff had been charged with aggravated domestic violence. *Id.* at 525. Rambo was the investigating officer; he compiled his investigative findings into a report and submitted it to the prosecutor's office. *Id.* The prosecutor's office charged the plaintiff with assault. *Id.* Upon learning of the charge, the plaintiff voluntarily went to her arraignment. *Id.* After the arraignment, she went to the police station and was processed and fingerprinted. *Id.* In that case, the court found that Rambo did not effectuate the arrest of the plaintiff, and that the plaintiff was never arrested at all because she voluntarily came to the police station. *Id.* at 529–30.

The present case is distinguishable from *Skousen*. A fact missing from that case was an arrest warrant. In our case, Detective Pokely submitted her narrative report to the Prosecutor's office who charged Plaintiff with sexual misconduct. However, an arrest warrant was also obtained, and Detective Pokely testified at the hearing to request the warrant. Though Plaintiff "voluntarily" went to the police station after learning there was a warrant for his arrest, he was submitting to an act which indicated an intention to take him into custody, in the form of the arrest warrant, by the state. Further, the Supreme Court has held in dicta that a submission to an arrest warrant is a "seizure" for the purposes of the Fourth Amendment. *Albright*, 510 U.S. at 271.

However, as discussed above, Officer Pokely had probable cause to arrest Plaintiff. If an officer had probable cause to make the arrest, there can be no claim for an unlawful seizure. Therefore, Defendants will be granted summary judgment on this issue because there was probable cause to make the arrest.

(b)     Plaintiff's Procedural Due Process Claim is Without Merit

Plaintiff also contends that his procedural due process rights have been violated. Plaintiff's claim in this regard centers around both his criminal prosecution and the termination of his visitation rights. Assuming *arguendo* that Plaintiff has demonstrated a protected right, he still must show that the process afforded by the State, before the deprivation, was constitutionally deficient. *Mathews v. Eldridge*, 424 U.S. 319 (1976). In *Mathews*, the Supreme Court established guidelines for determining the sufficiency of the process: 1) the private interest that will be affected by the official action; 2) the risk of an erroneous deprivation of such interest through the procedures used, 3) the probable value, if any, of additional or substitute procedural safeguards; and 4) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.* at 334–35. The Court also stated, "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333. *See also Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005) ("Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before

depriving that person of a property or liberty interest.").

Before Plaintiff's visitation rights were temporarily suspended, there was a hearing on October 24, 2003, and another hearing was held before his visitation rights were indefinitely suspended where Plaintiff's attorney cross-examined all the witnesses. These hearings provided Plaintiff with an opportunity to be heard in a meaningful way. Further, before Plaintiff was arrested, the Prosecutor's office obtained an arrest warrant from the Magistrate, and Plaintiff was afforded an opportunity at the preliminary exam hearing to present evidence in his favor. Plaintiff was given ample opportunities to be heard before any action was taken against him. Therefore, Plaintiff's procedural due process rights were not infringed.

(c)     Summary Judgment Will Also Be Granted in Favor of the Defendants on Plaintiff's Equal Protection Claim.

To establish an equal protection claim, a plaintiff must show that the state has made a distinction which has either: (1) burdened a fundamental right, (2) targeted a suspect class, or (3) intentionally treated one differently from others similarly situated without any rational basis for the difference. *Radvansky v. Olmsted Falls*, *supra*, 395 F.3d at 312 (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Plaintiff has not alleged that he was a member of a targeted class or that he was treated differently from others similarly situated without any rational basis. Rather, he claims that Detective Pokely burdened his fundamental right to parenting, and his right to be free from unlawful seizures. [Amend. Comp. at ¶ 153]. As addressed above, there was probable

cause for the arrest, therefore, the claim of unlawful seizure will not succeed. The only question then is whether Detective Pokely burdened Plaintiff's fundamental right to parenting.

It has been established that the Constitution recognizes a substantive fundamental right to raise one's child. *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000). Even though the process afforded by a government to an individual before his right is infringed upon may be constitutionally sufficient, a government may not burden a fundamental right "unless the action is necessary and animated by a compelling purpose." *Id.* at 557–58. Although a parent has a fundamental right to raise his child, the state "has a concomitant interest in the welfare and health of children in its jurisdiction, and in certain narrowly-defined circumstances, the State's interest in a child's well-being may supersede that of a parent." *Id.* at 558. Where the state believes a child has been subjected to sexual abuse, a state's interest in a child's well-being may supersede the right of a parent. *Id.* (holding that State of Michigan did not violate mother's fundamental right in raising her child when it terminated her parenting rights where it was found that the child was subjected to child abuse).

On October 24, 2003, Referee Michael Hand suspended Plaintiff's visitation rights with his children. Plaintiff contends that this violated his fundamental parenting rights. The question in this case is whether the government had a compelling interest to suspend Plaintiff's parenting rights. If Plaintiff's visitation rights had not been suspended, his

access to Elizabeth would have continued.  At the time Referee Hand determined to

terminate the Plaintiff's parenting rights, there was probable cause that Plaintiff had

sexually abused his daughter Elizabeth.  Given that there was probable cause of sexual

abuse, Defendants did not violate Plaintiff's fundamental right to raise his children.

4.     PLAINTIFF'S CONSPIRACY CLAIM FAILS SINCE THERE IS NO
       EVIDENCE THAT DEFENDANT POKELY ACTED WITH SOME
       RACIAL OR OTHERWISE CLASS-BASED ANIMUS.
       Plaintiff also asserts a federal conspiracy claim against the Municipal Defendants.

This claim is fully discussed in Section B(2)(b) of this Opinion.  As discussed above,

Plaintiff's failure to present any evidence suggesting that Defendants were motivated by

any racial or class-based animus mandates dismissal of this claim.

5.     <u>DETECTIVE POKELY IS CLOAKED WITH QUALIFIED IMMUNITY</u>

Qualified immunity shields public officials who perform discretionary functions from the necessity of defending against tort liability so long as their conduct does not violate clearly established rights of which a reasonable official would have known. *See Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir.), *cert. denied*, 546 U.S. 1075 (2005). The doctrine is designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 452 U.S. 800, 818 (1982). It is well established that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity is an affirmative defense, and once asserted shifts the burden of proof to the plaintiff to show that the defendant is not entitled to qualified immunity. *Armstrong v. City of Melvindale*, 432 F.3d 695, 699 (6th Cir. 2006).

Whether qualified immunity applies turns on the "objective legal reasonableness" of the official's action, viewed on a fact-specific, case-by-case basis. *Id.* The Sixth Circuit employs a two-part analysis when determining qualified immunity: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*,

533 U.S. 194, 201 (2001)).[14]  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Further, "[w]hether a constitutional violation occurred is a threshold issue: if [Detective Pokely's] conduct violated no constitutionally protected right, there is no need for further analysis."  *Armstrong*, 432 F.3d at 699.

As discussed in the above sections, even when viewing the facts in the light most favorable Plaintiff, Detective Pokely did not violate any of Plaintiff's constitutional rights; therefore, no further inquiry is needed beyond this point.[15]  Detective Pokely is shielded by qualified immunity.

6.      THERE IS NO FACTUAL BASIS FOR PLAINTIFF'S CLAIM OF
        *MONELL* LIABILITY AGAINST THE CITY OF TROY

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that municipalities and local governments are persons suable under 42 U.S.C.

---

[14]  In some Sixth Circuit cases, a three-step qualified immunity analysis has been employed.  *See Taft v. Toms*, 338 F.3d 519, 524 (6th Cir. 2003) (adding step requiring plaintiff to allege sufficient facts to show the official acted "objectively unreasonable in light of the clearly established right").  However, in cases subsequent to *Saucier*, the Supreme Court has not formally broken up the two steps into three.  *See, e.g., Brosseau v. Haugen*, 543 U.S. 194 (2004); *Groh v. Ramirez*, 540 U.S. 551, 563 (2004).  Since the two-step approach comports with the Court's most recent qualified immunity cases, it is the approach that will be applied here.

[15]  Even if a constitutional right was found to be violated in this case, it likely would fail the second step in the test.  In *Armstrong*, 432 F.3d at 699, the court stated, "In the context of an unconstitutional warrant, an official 'will not be immune if . . . it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.'"  *Armstrong*, 432 F.3d at 699 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  This standard is met here.

§1983.  However, the Court also concluded that a local government may only be sued under §1983 when the execution of a government's policy or custom, for which the government as an entity is responsible, inflicts the injury.  *Id.*  The Sixth Circuit has held that for a government entity to be held liable under §1983, the entity's policy or custom must be the moving force behind the deprivation.   *S.H.A.R.K. v. Metro Parks*, 499 F.3d 553, 563 (6th Cir. 2007).

As indicated, under §1983, Plaintiff must plead and prove (1) that some person has deprived him of a federal right, and (2) that the person has done so under color of state law.  *Adickes v S.H. Kress & Co.*, *supra*.  As set forth above, the Court has concluded that Mr. Molnar's federal rights were not violated.  Thus, the City of Troy may not be found liable under §1983 where no constitutional violation has been shown.  However, even assuming *arguendo* that Plaintiff may still pursue his *Monell* claim against the City, there is no factual support for any such claim.

Wrongful conduct by a single city officer who has no policy-making authority does not by itself establish municipal policy or custom, for purposes of determining municipal liability pursuant to *Monell*.  *Radvansky v. City of Olmsted Falls*, *supra* 395 F.3d at 311.  A governmental entity can be held liable under § 1983 only if a plaintiff establishes an unconstitutional action that implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.  *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006).

To demonstrate that the City of Troy is liable under *Monell*, the Plaintiff must: (1) identify the municipal policy or custom; (2) connect the policy to the municipality; and (3) show that his particular injury was incurred due to execution of that policy. *Alkire v. Irving*, 330 F.3d 802, 814–15 (6th Cir. 2003).

Plaintiff claims that policy in question is that the City of Troy fails to train its officers in investigating claims of child sexual abuse. [Complaint ¶¶231–34]. Plaintiff must show that his injury resulted from an execution of that policy. However, Plaintiff has failed to provide any evidence that the City of Troy, as a matter of policy or custom, failed to provide training for Detective Pokely with regard to investigating claims of child sexual abuse. In fact, Detective Pokely states in her affidavit that the City of Troy provided her "with extensive training in investigation of child sexual abuse cases," and that the City of Troy provides her with ongoing training. [Defendants' Exhibit 1 at 2, ¶¶10–12]. Since Plaintiff's allegation is that Detective Pokely caused his alleged injury and there is evidence that Detective Pokely did have training investigating claims of child sexual abuse, Plaintiff cannot show that his particular injury resulted from the identified policy in question. Summary judgment, therefore, will be found in favor of the City of Troy on this issue.

D.    PLAINTIFF HAS NOT ESTABLISHED A CLAIM OF INTENTIONAL
       INFLICTION OF EMOTIONAL DISTRESS

Plaintiff's final claim against the Care House and Municipal Defendants is a claim of intentional infliction of emotional distress.

The Michigan Supreme Court has never adopted the tort of intentional infliction of emotional distress into Michigan jurisprudence. *See Smith v. Calvary Christian Church*, 462 Mich. 679, 686 n. 7, 614 N.W.2d 590, 593 n. 7 (2000); *Roberts v. Auto Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905, 907 (1985); *Khalifa v. Henry Ford Hospital*, 156 Mich. App. 485, 499, 401 N.W.2d 884, 890 (1987); *Andrews v. Prudential Securities, Inc.*, 160 F.3d 304, 309 (6th Cir.1998). However, the Michigan Court has described the standards that would have to be met for satisfaction of such a claim:

> The cases thus far decided have found liability only where the defendant's conduct had been extreme and outrageous. It has not been enough that the defendant acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Roberts v. Auto Owners, supra*, 422 Mich. at 602-603, *quoting* Restatement 2d of Torts, §

46, comment d.

Applying the standards enunciated by the *Roberts* court, Plaintiff's claim for intentional infliction of emotional distress in this case fails. The actions of the Care House and Municipal Defendants do not amount to conduct has been "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, to be regarded as atrocious, and utterly intolerable in a civilized community." Accordingly, this claim will be dismissed.

## CONCLUSION

For all of the foregoing reasons and for the further reasons stated by the Court on the record on August 28, 2008,

IT IS HEREBY ORDERED Defendants Motions for Summary Judgment [Dkt. Nos. 10 and 37] are GRANTED. Defendants' Motion for Sanctions [Dkt. No. 22] is DENIED.

IT IS FURTHER ORDERED that the Care House Defendants' Motion to Extend Scheduling Order Deadlines or for Stay [Dkt. No. 42] is DENIED as MOOT.

The Court having dismissed, by this Opinion and Order, all claims in this action over which it has original jurisdiction, pursuant to 18 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over Plaintiff's state law defamation and false light claims against his ex-wife, Defendant Renee Molnar. Accordingly,

IT IS FURTHER ORDERED that Plaintiff's state law defamation and false light

claims in Counts Four and Six of his Amended Complaint are DISMISSED, WITHOUT

PREJUDICE.


                              s/Gerald E. Rosen_____
                              Gerald E. Rosen
                              United States District Judge

Dated:  September 4, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 4, 2008, by electronic and/or ordinary mail.

                              s/LaShawn R. Saulsberry_____
                              Case Manager